# *Exhibit A*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA PATRICO, individually as a participant in and on behalf of the Nestle 401(K) Savings Plan, and on behalf of a class of all other participants in and beneficiaries of the Nestle 401(k) Savings Plan and all other similarly situated participants and beneficiaries of other plans,<br><br>       Plaintiff,<br><br>v.<br><br>VOYA FINANCIAL, INC.; VOYA INSTITUTIONAL PLAN SERVICES, LLC and VOYA RETIREMENT ADVISORS, LLC<br><br>       Defendants. | CASE NO.: 1:16-cv-07070-LGS-JLC<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**(ERISA)** |

1

## PRELIMINARY STATEMENT

1.     Plaintiff Lisa Patrico, as a participant in the Nestle 401(k) Savings Plan ("Nestle Savings Plan"), brings this action on behalf of the Nestle Savings Plan and as a class action on behalf of and all other similarly situated participants in and beneficiaries of the Nestle Savings Plan and all other qualified retirement plans (together with the Nestle Savings Plan, "Plans"), under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Voya Financial, Inc., f/k/a ING U.S., Inc. ("Voya Financial"), Voya Institutional Plan Services, LLC, f/k/a ING Institutional Plan Services, LLC ("Voya Institutional") and Voya Retirement Advisors, LLC, f/k/a ING Investment Advisors, LLC ("VRA," together with Voya Financial and VIPS, "Voya" or "Defendants").

2.     Plaintiff and the class members are participants in the Plans, which are participant directed, individual account, ERISA-covered defined contribution retirement plans. Plaintiff and the class members received professional account management services ("PAM Services") from a company called Financial Engines, LLC ("Financial Engines" or "FE"). Through the PAM Services, Financial Engines controlled the allocation of the retirement savings in Plaintiff's and the class members' accounts among the available investment options in their Plans, pursuant to a computerized model that was designed, maintained, implemented, communicated and managed by Financial Engines.

3.     This case concerns the fees paid by the retirement plan investors for the PAM Services. As detailed below, Financial Engines provides a turnkey computer-based program that provides retirement plan investors with professional asset management advice, for which it charges an asset-based fee.  Financial Engines wanted access to the accounts of all the retirement plan

participants in plans for which Voya Institutional served as recordkeeper.  In a classic pay-to-play scheme, Voya Institutional agreed to appoint Financial Engines as the investment manager for those Plans on its recordkeeping platform that elected to participate in the PAM Services, provided that Voya would receive a substantial portion of the total fee collected for the PAM Service. In an apparent effort to hide the true nature of Voya's role in providing the managed account services, Voya Institutional interposed VRA ostensibly as the investment manager providing the PAM Services, using Financial Engines as a subadvisor.  In fact, VRA did not and never intended to provide any managed account services or advice to participants.  It was merely a front that did nothing more than re-brand the services performed by Financial Engines and mark up the price by more than 100%.  The true relationship between VRA and Financial Engines is memorialized in a separate agreement between VRA and FE called the Restated Advisory and Data Services Agreement (referred to herein as the "Master Agreement").[1]

4.      As explained in more detail below, VRA did not provide any material services in exchange for the fees VRA collected for the PAM Services. Instead, the fees VRA received were simply a kickback.

5.      All of the account management services provided to retirement plan investors were performed by Financial Engines.

6.      Furthermore, virtually all of the administrative services to be provided by VRA related to the account management services were already being provided by Voya Institutional as the Plans' recordkeeper. Voya Institutional was separately compensated for its services as recordkeeper. Thus the payments to VRA under the Investment Advisory Service Agreements (the "IASAs") for those same services amounted to an impermissible "double-dip."

---

[1] The Master Agreement was previously filed as Docket Nos. 40-1 & 40-2.

7. The Plans wished to provide on behalf of their participants a managed account service along the lines of the PAM Services. Voya Institutional, as the recordkeeper and platform provider for each of the Plans, used its control over the Plans to compel or induce the Plans to hire VRA to provide Financial Engines' PAM Services, even though it was Financial Engines, and not VRA, that performed all material components of the PAM Services. Voya Institutional, acting through VRA, then demanded (and received) kickbacks from Financial Engines. Financial Engines was willing to pay the kickbacks to Defendants in order to get access to customers like Plaintiff and the Plans.

8. Defendants attempted to conceal the true nature of the kickbacks by describing services that Defendants claimed VRA provided in exchange, but Voya Institutional was in fact already obligated to provide those services as the recordkeeper and platform provider. Thus, Defendants did not provide any material services, apart from services that Voya Institutional was already obligated to provide as the Plans' recordkeeper and platform provider, in exchange for most of the fees the Plan participants paid for the PAM Services. As a result of the extra fees that Defendants demanded, Plaintiff and the Class Members ended up paying significantly higher fees for the PAM Services than was otherwise necessary.

9. Regardless of Defendants' status as fiduciaries, the payment of these fees violated numerous provisions of ERISA. This should come as no surprise, since preventing excessive and unreasonable fees is at the core of ERISA's protective regime.

10. Regardless of the status of VRA or Voya Institutional as fiduciaries, the named fiduciaries of the Plans (the "Named Fiduciaries") were obviously fiduciaries.  The Named Fiduciaries violated their duty of prudence and had actual or constructive knowledge that the agreements they entered into with VRA were prohibited and included excessive fees to VRA.

Because VRA and Voya Institutional knowingly participated in and benefitted from those prohibited transactions, they must disgorge their ill-gotten profits. Voya Financial, as the ultimate corporate parent of both VRA and Voya Institutional, also on information and belief, received the benefits of this misconduct, and the knowledge of its subsidiaries (VRA and Voya Institutional) is imputed to it. Thus, Voya Financial also must disgorge the benefits it received.

11.     Of course, VRA and Voya Institutional are also fiduciaries for the Plans for several reasons. VRA is an express fiduciary pursuant to the IASAs, and in that capacity has express fiduciary authority with respect to (i) the appointment of Financial Engines as a fiduciary for the Plans, and (ii) determining the amount of PAM Service fees to pay Financial Engines, which leaves it with control over how much it keeps for itself. Voya Institutional is de facto fiduciary by virtue of its control over the appointment of Financial Engines and VRA as fiduciaries for the Plans. Thus, both VRA and Voya Institutional are also liable for their own fiduciary breaches and prohibited transactions, as well as their breaches of co-fiduciary duty.

12.     Furthermore, on information and belief, every participant electing to participate in the managed account program was required to sign an agreement with VRA.  In every new contract with each participant, executed after VRA was an express fiduciary to the Plans under the IASA, VRA represented that it was performing substantial services as an investment manager; a representation Plaintiff alleges was demonstrably false.  As an acknowledged fiduciary to the Plan and its participants, VRA was obligated to be truthful to participants. *Varity Corp. v. Howe,* 516 U.S. 489 (1996).

## JURISDICTION

13.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2), and (3). This Court has subject matter jurisdiction over Plaintiff's claims pursuant

to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964; 28 U.S.C. §§ 1331, 1332 and 1367; and 15 U.S.C. § 15.

14.     Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), venue is proper in this District because Defendant Voya Financial has its principal place of business in this District. In addition, violations alleged herein occurred in this District.

## THE PARTIES AND THE PLANS

15.     At all relevant times (the "Relevant Period"), Plaintiff Lisa Patrico has been a participant in the Nestle Savings Plan, an ERISA Plan as defined in ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Patrico enrolled in the PAM Services and was subject to the fees at issue.

16.     At all relevant times, the Nestle Savings Plan was an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

17.     The Nestle Savings Plan allows participants to self-direct their contributions and account balances to various mutual funds and other collective investment options. The Nestle Savings Plan allows participants to enroll in the PAM Services provided by FE.

18.     Defendant Voya Financial, Inc., f/k/a ING U.S., Inc. ("Voya Financial") is a Delaware corporation with its headquarters in New York, New York. Voya Financial's stock is traded on the New York Stock Exchange under the ticker symbol "VOYA."

19.     Defendant Voya Institutional Plan Services, LLC, f/k/a ING Institutional Plan Services, LLC ("Voya Institutional"), is a Delaware limited liability company with its principal place of business in Connecticut. Voya Institutional is an affiliate and wholly-owned subsidiary of

Voya Financial, and acts as an agent for Voya Financial with respect to its conduct described herein. References to "Voya Institutional" shall include Voya Institutional's predecessor, ING Institutional Plan Services, LLC.  Voya Institutional provides recordkeeping and information management services for employee benefit plans.

20.     Defendant Voya Retirement Advisors, LLC, f/k/a ING Investment Advisors, LLC ("VRA"), is a New Jersey limited liability company with its principal place of business in Connecticut. VRA is an affiliate and wholly-owned subsidiary of Defendant Voya Institutional, and is therefore an affiliate and indirect subsidiary of Voya Financial. VRA acts and acted as an agent for Voya Institutional and Voya Financial with respect to its conduct described herein. References to "VRA" shall include VRA's predecessor, ING Investment Advisors, LLC. VRA provides investment advisory services for employee benefit plans for which it receives direct compensation from the Nestle Savings Plan and other Plans, and receives indirect compensation from other service providers to the Plans in connection with the services VRA provides to the Plans.

## DEFENDANTS' KICKBACK SCHEME

21.     The Plans are participant directed, individual account, defined contribution, retirement savings plans covered by ERISA within the meaning of ERISA § 3(2), (3) & (34). Defined contribution plans like the Plans permit employees to contribute a portion of their salary and wages on a pre-tax basis in order to save for retirement. In many cases, the employer-sponsors make matching contributions and/or profit-sharing contributions to supplement the employees' contributions. In the Plans, what the participants get at retirement is simply what is in their individual accounts at retirement—the money they or their employers contributed, plus investment

returns (positive or negative), ***less fees and expenses paid***.[2]

22.     The Plans, as is typical of many defined contribution plans, designate a number of mutual funds or other collective investment funds as "designated investment alternatives" and give individual Plan participants the ability to choose how their Plan accounts will be invested by allocating their accounts among the designated investment alternatives. In fact, the Plans, including the Nestle Savings Plan, actually transfer the entire responsibility and liability for investment decisions to the participants.

23.     Defendants provide various types of services to qualified retirement plans subject to the provisions of ERISA and directly or indirectly to the Plans in connection with the matters alleged in this Complaint. Generally, the claims in this case relate to two types of services – recordkeeping and managed or discretionary account responsibility. Both generally and with respect to the Plans, recordkeeping and managed account services are distinct services provided by different types of entities pursuant to separate arrangements.

24.     As set forth below, Voya Institutional leveraged its status as the Plans' recordkeeper to dictate which investment manager would provide managed account services to the Plans and to exercise discretion as to what the investment manager would be paid.  Voya Institutional thus extracted significant fees for its wholly owned subsidiary VRA related to the PAM Services the Plans received despite the fact that neither it nor VRA performed any new material services in connection with those services.  Through the Plans' recordkeeping agreements with Voya Institutional, the Plans were already receiving from Voya Institutional, and paying for, the services

---

[2] *See* ERISA § 3(34) (an individual account defined contribution plan is "a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account.").

that Defendants claimed VRA was providing in connection with the managed account services.

25.     As both Defendants and the Named Fiduciaries are well aware, fees paid by retirement plans for non-existent services, like salaries for no-show jobs, are a form of graft and simply a mechanism for hiding what is nothing more than kickbacks, and are absolutely prohibited by ERISA.

26.     As a result, as alleged in more detail below, Defendants undertook to conceal the true nature of these fees through a complex scheme, including Voya Institutional's use of a subsidiary, VRA, which provides no material services in exchange for the fees. To the extent that Voya Institutional seeks to justify VRA's receipt of the fees based on services that VRA or Voya Institutional provided, all such services were already owed by Voya Institutional under its recordkeeping agreements with the Plans. Any payment with respect to the managed account function based on those services would amount to an impermissible double-dip.

***Defendant Voya Institutional's Role as the Plans' Recordkeeper***

27.     Voya Institutional provides recordkeeping and platform services to the Plans. As is typical of recordkeepers, in that capacity Voya Institutional provides a range of important services to the Plans.

28.     Those services are defined in various Administrative Services Agreements ("ASAs" or "Administrative Agreements").

29.     The ASA between Voya Institutional and the Nestle Savings Plan is attached hereto as Exhibit 1. The Nestle ASA and the ASAs with the other Plans are substantively identical for all material purposes.

30.     At the core of Voya Institutional's responsibilities as recordkeeper for the Plans was keeping records of the value of the assets in each participant's individual account and the

allocations each participant made among the available investment options.

31.    In addition, Voya Institutional was responsible for processing and recording transactions including deposits into and withdrawals from each participant's account, and allocating the deposited or withdrawn sums to the available investment options.

32.    Voya Institutional maintained a call center and an online web portal through which participants could obtain information about the value and allocation of their accounts and the available investment options offered by their Plans.

33.    In addition, participants could log into the online web portal or contact the call center to initiate transactions to or from their accounts or change how the existing funds in their accounts and/or new contributions would be allocated among the available investment options.

34.    Voya Institutional also provided periodic statements to participants reflecting the value of their individual accounts and identifying the participants' investment allocations.

35.    The ASAs also gave Voya Institutional primary responsibility for preparing the Annual Report Form 5500 for each of the Plans.

36.    Voya Institutional is compensated for the services it provides under the ASAs pursuant to fee schedules attached to the ASAs.

37.    Notably, the ASAs make clear that investment advisory services, including managed account services such as the PAM Services, are separate services provided under a separate agreement with a separate compensation schedule. *E.g.*, Exhibit 1 at VRA0001046 (listing investment advisory services as "Additional Services" as to which the "Fees and services" are "listed within [the separate IASA]").

38.    A plan fiduciary's selection of a recordkeeper for an ERISA plan is a costly, time consuming and significant decision. Fiduciaries, especially of large plans such as the Nestle

Savings Plan, often solicit multiple bids from many recordkeepers through an RFP process and engage in complex and protracted negotiations with prospective recordkeepers. In addition, changing recordkeepers typically costs a significant amount of time and money.

39.     Moreover, because of the central importance of the recordkeeper to administering defined contribution plans, plan fiduciaries and sponsors often, as a practical matter, rely on recordkeepers for guidance and suggestions about how to run their plans. The reason is obvious – for most plan sponsors and their in house named fiduciaries, running retirement plans is simply not the focus of their business. Recordkeepers on the other hand are repeat players in the market, and administering retirement plans is the central focus of their business.

***Financial Engines***

40.     As noted above, in a participant directed individual account plan like the Plans, the participants' investment decisions can have a dramatic impact on the amount of retirement savings they end up with.

41.     Many participants do not feel comfortable making those decisions on their own, and seek guidance from investment advisors to help them manage their retirement savings.

42.     Financial Engines provides two related types of investment advice.

43.     In both cases, using a computer algorithm (called "Advice Engines"), Financial Engines collects data about participants, including their age, their savings, their retirement goals and risk tolerance, and automatically generates proposed investment allocations among the available investment options in the plan.

44.     For one program, the "Online Advice Service," Financial Engines has developed all the communications describing the program, collects personal data from participants (which participants input directly to Financial Engines), has access to each participant's plan account,

current investments and contribution history, and by applying its computer-based program referred to above, makes recommendations to participants about how to allocate their accounts among the Plan's available investment choices.   Participants are free to accept or reject those recommendations.

45.     Online Advice Services are paid for on a per-participant basis; that is, a specific dollar amount for each participant eligible to use the program, which is usually all participants in the plan.

a. 

46.     The other program, the PAM Services, goes one step further. In particular, the PAM Services actually take control of the participant's account, and implement the allocation generated through the Advice Engines algorithm. The only difference between the development, communication, implementation and management of the Online Advice Service and the PAM Service is that in the PAM Service, Financial Engines reviews the participant's account on a regular schedule, rather than when the participant asks, and automatically implements the recommendations developed by its computer program.  Most importantly, there is no difference between (i) the level of service and connectivity required to be provided by VRA or Voya

Institutional for the Online Advice Service and (ii) the level of service and connectivity required to be provided by VRA for the PAM Service.

47.     There is, however, a dramatic difference in the fees paid, and in the amount of the fees received by VRA.

48.     As noted, the Online Advice Services are priced as a flat dollar amount per eligible participant. ███████████████████████████████████████████

███████████████████████████████████████ *See* Master Agreement, at VRA0000026.

49.     The PAM Services, on the other hand, are typically paid for on the basis of a percentage of the assets under management, and the fees are collected by selling a portion of the securities in the participant's account sufficient to cover the fee. *See* Exhibit 2, Financial Engines Form ADV, Part 2A Brochure, at 7.

50.     ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████  ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

51.     For the first quarter of 2016, Plaintiff paid a managed account fee of $197.34, representing an annualized fee of $800.

52.     Plaintiff is not aware of the aggregate compensation paid to either VRA or Financial Engines as a result of the switch to the PAM Service because Defendants failed to disclose either the total compensation paid for the PAM Services or the amounts paid to either VRA or Financial Engines, as they were required pursuant to 29 CFR 2550.408b-2(c). *See* ¶¶ 96-99, *infra*.

53.     Under the PAM Services, Financial Engines exercises "discretionary authority" over the allocation of participant accounts among the available investment options. *See* Exhibit 3, Financial Engines 2015 Annual Report Form 10-K, at 4; *see also* Ex. 2, FE Form Adv. Sched. 2, at 7.

54.     Financial Engines has represented publicly that it provides its Online Advice Service and the PAM Services "as a fiduciary under [ERISA]." Exhibit 4, Letter of Financial Engines, at 1.

55.     In order to make money, however, Financial Engines needs access to customers – primarily individual account plan participants.

56.     Recordkeepers, like Voya Institutional, who have established relationships with plans, can provide service providers like Financial Engines with access to the customers that Financial Engines needs.

***The Deal Between Financial Engines and Voya***

57.     Financial Engines admits that it "primarily" relies on relationships with recordkeepers like Voya Institutional to sell its services to plan participants. Ex. 3, FE Form 10-K, at 4.

58.     Because Financial Engines wants access to the customers that the recordkeepers can provide, Financial Engines is willing to see that the recordkeepers or their affiliates get paid for providing that access in a classic pay-to-play scheme.

59.     Financial Engines and the recordkeepers it deals with structure their relationships with plans in one of two ways: either as a "direct advisory relationship" where Financial Engines and the Plan enter into a direct relationship with each other, or as a "subadvisory relationship" where the recordkeeper or its affiliate "is the primary advisor and plan fiduciary" and Financial Engines "act[s] in a subadvisory capacity." Ex. 3, FE Form 10-K, at 9-10.

60.     Despite the different formal structures between the "direct advisory relationship" and the "subadvisory relationship," there is no substantive difference in the services provided or which entity provides the service. In both cases, Financial Engines provides exactly the same investment advisory and managed account services.  While in the subadvisory relationships, the services are marketed under the brand name of the recordkeeper or its affiliate and "identified as 'powered by Financial Engines,'" all of the services are actually provided by Financial Engines under both structures. Ex. 3, FE Form 10-K, at 9-10.

61.     The fees paid to the recordkeepers or their affiliates take different forms under the arrangements, but are substantively the same.

     a.     Under the "direct advisory relationships", Financial Engines – which is paid directly by the Plan – "pay[s] fees to the [recordkeeper or its affilate] for facilitating the exchange of plan and plan participant data as well as implementing our transaction instructions for member accounts."  Considering the level of services provided by the recordkeeper (services already paid for by participants pursuant to the recordkeeping agreement) and the amount of the fee paid to VRA ███████ ████████████████████████████████████████████, this is clearly not a reasonable fee in relation to the service provided.  It is instead quite simply an illegal kickback in exchange for selecting FE as the exclusive provider of account

management services on the Voya platform.

    b.   In the subadvisory relationship, "[r]evenue is collected by the plan provider who then pays a subadvisory fee" to Financial Engines. Ex. 3, FE Form 10-K, at 9-10.

    c.   In both cases, however, the recordkeeper or its affiliate is not providing any material services; all of the investment advisory services are actually being provided by Financial Engines.

    d.   Instead, whether the fees are collected directly from the Plans (out of which a portion is paid to FE) in the subadvisory relationship, or collected indirectly from Financial Engines in the "direct advisory relationship," the fees received by the recordkeepers or their affiliates are nothing more than a kickback.

62.    Voya Institutional, as recordkeeper, knows that Financial Engines needs access to the participants in the plans for which Voya Institutional provides recordkeeping and administrative services, and Financial Engines wants access to Voya Institutional's plan clients.

63.    So Voya Institutional and Financial Engines entered into a pay-to-play scheme – a quid pro quo where a significant portion of the fee paid for managed account services goes to Voya Institutional (in particular, to its subsidiary VRA), even though Financial Engines provides all the managed account services, so that Financial Engines gets access to Voya Institutional's Plan clients.

64.    Voya Institutional and its affiliates and Financial Engines structure their relationship with the Plans as a "subadvisory relationship." Ex. 3, FE Form 10-K, at 10; *see also* ¶¶ 59-61, *supra*.

65.    The arrangement between Defendants and Financial Engines is reflected in the Master Agreement. The Master Agreement bears an "effective date" of January 1, 2009. Master

Agreement, at VRA0000002.

66.     The Master Agreement, consistent with the "subadvisory relationship", provides that VRA will be the direct service provider and Financial Engines will be a subadvisor.

67.     In furtherance of this structure, the Master Agreement incorporates a form "Investment Advisory Services Agreement" (or "IASA") with VRA as the direct advisor. Under the IASA, VRA recites that it "has engaged" Financial Engines as a subadvisor providing all of the investment advice and PAM Services. Master Agreement, at VRA0000005, § 2(I)(A)(ii)(c).

68.     The Master Agreement contemplates that the Named Fiduciaries of each Plan will execute a separate IASA with VRA, containing substantially similar terms. Master Agreement, at VRA0000005, § 2(I)(A)(ii)(c).

69.     Acting in their fiduciary capacities, the Named Fiduciaries of each Plan in fact executed IASAs that are not materially different from the form incorporated into the Master Agreement.

70.     The form IASA incorporated into the Master Agreement contained the following material terms, which were not materially modified in any of the IASAs that the Named Fiduciaries executed:

     a.   The Named Fiduciary of each Plan entered into the IASA as a fiduciary act on behalf of its Plan and represented that it was duly authorized to do so; Master Agreement, Sample IASA, at VRA0000036, § 3(b),

     b.   VRA acknowledged that it was an ERISA fiduciary within the meaning of ERISA § 3(21) "with respect to the services provided" under the IASA; Master Agreement, Sample IASA, at VRA0000036, § 2(b),

     c.   VRA agreed that it would "discharge its duties" under the IASA in a manner

consistent with ERISA's fiduciary duties; Master Agreement, Sample IASA, at VRA0000037, § 4,

    d.   VRA was "responsible for the payment of any compensation due to Financial Engines in connection with the investment advisory services"; Master Agreement, Sample IASA, at VRA0000037, § 6,

    e.   VRA represented that it (as opposed to the Plan's Named Fiduciaries) "has engaged" Financial Engines "to provide the investment advice." Master Agreement, Sample IASA, at VRA0000041, Exhibit A.

71. In exchange for the promotional services and access to Plan participants that Defendants were providing to Financial Engines through the Master Agreement, Financial Engines and VRA agreed that VRA would collect the fees for Financial Engines' services from the Plans and would pay Financial Engines a portion of the fees collected.

72. In particular, with respect to the PAM Services, in the Master Agreement VRA agreed to pay Financial Engines ███████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████ Master Agreement, at VRA0000023, Exhibit B.

73. The fees for the PAM Services were to be "charged to participants' accounts each month." Master Agreement, Sample IASA, at VRA0000045, Exhibit B.

***VRA and Voya Institutional Influenced, Agreed to and Controlled the Named Fiduciaries' Decisions to Retain VRA and Financial Engines for Computerized Investment Advice Services***

74. Of course, the quid pro quo required by Financial Engines was that VRA and Voya Institutional would use their influence, including Voya Institutional's influence as the recordkeeper for the Plans, to get customers for Financial Engines.

75. In the Master Agreement, VRA agreed to "use commercially reasonable efforts and

diligence to market" Financial Engines' services to plans and their participants, Master Agreement, at VRA0000005, § 2(I)(A)(ii)(d), and to "use commercially reasonable efforts to facilitate awareness" of the services provided by Financial Engines. Master Agreement, at VRA0000013, § 7.2.

76. In addition, VRA agreed to a certain "Client Engagement Protocol," which obligated VRA:

  a. to meet at least quarterly with Financial Engines and "review the list" of all defined contribution plans with 5,000 or more participants to which VRA provided services "and develop strategies to introduce clients" to Financial Engines services;

  b. to agree with Financial Engines on "standard sponsor pricing;"

  c. to use commercially reasonable efforts "to insure the initial term" of each Plan's agreement with Financial Engines would be "three years or more;"

  d. to "inform Financial Engines in advance" of any conferences with any of VRA's clients "that include any specific presentation, breakout session, booth or demonstrations" where investment advice would be a primary topic;

  e. to agree that Financial Engines could be represented at or participate in any such conferences;

  f. to "include information in all marketing materials" regarding Financial Engines services "where the principal subject is guidance or advice;" and

  g. to include an offer to provide Financial Engines' services "in any sales or marketing efforts including, but not limited to RFPs and client requests."

Master Agreement, at VRA0000027, Exhibit C.

77. On information and belief, VRA and Voya Institutional actually carried out those

marketing efforts described in the Master Agreement when dealing with the Plans.

78.     On information and belief, there also was an unstated understanding between Voya Institutional and Financial Engines that Voya Institutional and VRA would exclusively rely on and promote Financial Engines for computerized investment advice and managed account services with the plans that it served as recordkeeper.

79.     On information and belief, as a result of VRA's and Voya Institutional's efforts and influence, Financial Engines (through VRA) was the only provider of computerized investment advice and managed account services for the plans that Voya Institutional served as recordkeeper.

80.     On information and belief, no plans entered into IASAs with VRA unless they had already agreed or determined to use Voya Institutional as their recordkeeper.

***Defendants Did Not Provide Any Material Services in Exchange for the Fees They Received***

81.     The Master Agreement stated that the fees received by VRA were in exchange for certain services.

82.     In particular, the Master Agreement stated that VRA received its portion of the fees for "establishing and maintaining secure communications links, data connectivity between the Parties' respective information systems, and fulfilling its other related obligations" under the Master Agreement. Master Agreement, at VRA0000022, Exhibit B.

83.     The only other services VRA was even nominally obligated to provide under the Master Agreement was transmitting various data about participant accounts to Financial Engines. Master Agreement, at VRA0000008, § 4.2.

84.     But as previously alleged, whatever services were being provided by VRA in connection with the PAM Service were exactly the same services being performed by VRA in connection with the Online Advice Service for years prior to 2012, but for a dramatically larger

fee.  Defendants, in their Motion to Dismiss, represented that the IASA fairly represents the scope

of VRA's services in connection with the PAM Services and they refer to the substantial nature of

those services as justification for VRA's very substantial fee.  But the services described in the

IASA, dated December 23, 2010 and more than a year before the Nestle Plans first implemented

the PAM Services, are clearly descriptive of the services being performed in connection with the

Online Advice Service.  Defendants have effectively admitted that there is no difference in the

services provided in connection with either the Online Advice Service, ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

85.     Moreover, the bulk of even those services are actually being performed and paid

for pursuant to the contractual obligation of Voya Institutional to provide recordkeeping services.

86.     The IASA ostensibly requires VRA to perform a range of services, including,

a.  maintaining a call center;

b.  engaging in telephone conferences with participants;

c.  collecting information about investments outside the Plan in order to provide more

informed recommendations; and

d.  providing "ongoing management of [participants'] account[s] which may include

i.   periodic increases of contributions to their accounts;

ii.  periodic rebalancing/optimizing investment allocations; and

iii. adjusting the portfolio risk level and resulting allocation over time based on

their changing retirement time horizon[.]"

Defs. Memorandum, Doc. 32 at 11-12.

87.     But it is Voya Institutional, the sole member of VRA, that was already obligated

for maintaining the call center (which engages in telephone conferences with participants)[3],

transaction processing and maintaining records of all transactions, preparation and delivery of

quarterly statements and plan communications and providing participants with access to and the

management of their accounts through the internet, interactive voice response system and personal

service representatives.  *See* Ex. 1, ASA, at VRA00001035-46.

88.     Other services attributed to VRA are actually performed by Financial Engines, such

as maintenance of customized websites, Master Agreement at VRA0000004, VRA0000008, and

preparation of communications materials, Master Agreement at VRA0000013.  All of the services

listed in ¶ 86.d above are initiated or performed by either the participant or Financial Engines.

89.     Even a cursory examination of other services demonstrates that there is little

difference between the services provided to participants under the ASA and the services VRA

claims to provide to Financial Engines:

> a.     Providing a web based portal for Financial Engines to request account allocation
>
> transactions and implementing those transaction requests generated by Financial
>
> Engines. There is no fundamental difference between the allocation requests made
>
> by a participant and those made by Financial Engines on a participant's behalf, and
>
> Voya Institutional was already responsible for maintaining a web based portal for

---

[3] The Master Agreement at VRA0000042 states expressly that the Voya Call Center will act solely as a non-discretionary conduit for the communication of information required of the participant under the program to Financial Engines and the communication of the investment advice generated by Financial Engines to the participant.

participants' allocation requests.

b. <u>Providing participant data to Financial Engines</u>. At the heart of Voya Institutional's role as recordkeeper under the ASA was keeping track of participant account information, and providing access to that information to participants on demand through the web portal and periodic statements. There is no material difference between providing that data to participants through the web portal and periodic statements and providing it to Financial Engines.

90.     Defendants did not incur any additional costs for performing the services for which they were purportedly compensated under the IASA and the Master Agreement, because Voya Institutional was already providing essentially the same services under the ASA.

91.     Thus, Voya Institutional was already being compensated under the ASA for the services that were purportedly provided by VRA or Voya Institutional in exchange for the fees, and those fees represented, at best, an impermissible double-dip.

92.     This arrangement is particularly troubling because VRA receives asset-based compensation for its purported services – for which there is no rational or economic justification. Moreover, prior to 2012 while the Nestle Plan was offering to participants only the Online Advice Service and VRA (of Voya Institutional) was providing to Financial Engines the same data connectivity VRA provided after Nestle contracted for the managed Account services, VRA was receiving only a per participant fee for that data connectivity.  The cost and value of the administrative services under the IASA do not change with the amount of assets invested, yet VRA's and FE's fees increase in proportion to the increase in the value of the account. Likewise, VRA and FE provide no greater service to one Plan participant whose account  invested $50,000 through FE than to another Plan participant whose account invested $75,000 through FE, yet

VRA's and FE's fee for the latter participant's account is ███████. Nor does the cost or value of maintaining a communications link between VRA or Voya Institutional and FE increase appreciably when the number of participants in a Plan using FE's services increases or the amount they have invested goes up, but VRA's and FE's fee for providing the service increases. Even if VRA were actually providing new services in exchange for the fees it received, an asset-based fee for a fixed level of service is on its face unreasonable.

93.     Moreover, The IASA and Master Agreement make it clear that all of the investment advice services at issue, including the PAM Services, were developed independently and provided by Financial Engines, with no input from Defendants.

94.     For example, the Master Agreement recited that

a.   "Financial Engines will provide" the investment advisory services, including the PAM Services; Master Agreement, at VRA0000007, § 4.1; Master Agreement, Sample IASA, at VRA0000041, Exhibit A at I,

b.   Financial Engines "will use its own methodologies to provide portfolio recommendations" and "will have sole control and discretion for the development and maintenance of such methodologies and recommendations;" Master Agreement, at VRA0000006, § 2(B)(III),

c.   the investment advisory services "have been developed and will be maintained and implemented" by Financial Engines; Master Agreement, at VRA0000006, § 2(B)(III),

d.   VRA and its affiliates did not have and had not had "any responsibility for or involvement in the development or maintenance of" the investment advisory services. Master Agreement, at VRA0000006, § 2(B)(III).

24

95.     As a result of Defendants' pay-to-play scheme and the resulting kickbacks or double-dipping Defendants took from the Plan accounts of Plaintiff and the other class members, the total cost of the PAM Services was increased significantly. As a matter of simple economics, Financial Engines, who actually provided the PAM Services, incurred costs and made a sufficient profit to cover its opportunity costs out of the portion of the PAM Service fees it received from VRA. The additional fees VRA kept for itself simply inflated the cost to participants, without providing any additional value to the participants in exchange.

***Defendants' Disclosure Violations***

96.     ERISA imposes several different disclosure regimes on plan fiduciaries and service providers. The different disclosure regimes have different sources and violating them leads to different consequences. As relevant here:

a.  29 C.F.R. § 2550.408b-2(c) imposes requirements on plan service providers to disclose a variety of information about the fees they charge and the services provided in exchange, depending on the type of service and the structure of the fee arrangement. The chief consequence of violating the 408b-2 disclosure regulations is that a service provider cannot satisfy the regulatory requirements necessary to claim that their compensation was provided under a reasonable contract or arrangement under ERISA § 408(b)(2).

b.  The instructions to the Annual Report Form 5500 impose additional disclosure requirements. While the consequences for failing to accurately disclosure information on the 5500s are not so dramatic, there are important overlaps between the two regimes and reading them side-by-side can shed important light about the nature of the obligations in each.

25

    c.   When communicating with plan participants, the duty of loyalty in ERISA § 404(a)(1)(A) requires ERISA fiduciaries to convey complete and accurate information about benefits under the plan. "The duty to fully and accurately disclose and explain material information to plan participants 'is the core of a fiduciary's responsibility.'" *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 552 (S.D.N.Y. 2015). "Fiduciaries may be held liable for statements pertaining to future benefits if the fiduciary knows those statements are false or lack a reasonable basis in fact." *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 84 (2d Cir. 2001) Fiduciaries may also be "liable for non-disclosure of information about a current plan when the omitted information was necessary to an employee's intelligent decision about retirement." *Id.* In other words, "[w]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." *Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 88 (2d Cir. 2001).

97.   Through discovery in this matter, Plaintiff has obtained copies of the 408b-2 disclosures by Defendants related to the investment advisory and managed account services for each of the Plans. None of the 408b-2 disclosures satisfies 29 C.F.R. § 2550.408b-2(c).

    a.   The disclosures follow one of two patterns. One group contains no separate disclosures relating to the investment advisory services whatsoever.[4]

    b.   The other group contains a separate disclosure for the investment advisory and

---

[4] *See* 408b-2 Disclosure for Nestle Savings Plan, attached as Exhibit 5.

PAM Services.[5] The disclosures in this group identify the formula for determining the total fees collected by VRA, but do not identify, with respect to the compensation paid among VRA and Financial Engines, "the payers and recipients of the compensation (including the status of a payer or recipient as an affiliate or subcontractor)" or "the services for which such compensation will be paid." 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(3).

c.   Certainly none of the disclosures produced reflects the truth – that VRA was receiving fees and not providing any material services in exchange.

d.   Because none of the 408b-2 disclosures contains the requisite disclosures, Defendants have not satisfied the disclosure obligations set forth under 29 C.F.R. § 2550.408b-2(c) and will not be able to claim that the compensation they received was made pursuant to a reasonable contract or arrangement under ERISA § 408(b)(2).

e.   These disclosures, which utterly fail to describe the allocation of services between VRA and FE, and of the fee split between them, as required by the 29 C.F.R. § 2550.408b-2(c), are deficient on their face and should have led any reasonably diligent plan sponsor to demand further information from VRA in order to properly evaluate whether the respective fees paid to VRA and FE were reasonable in relation to the services provided, or what was the true cost of the managed account services. Surely it would be highly relevant to a Named Fiduciary's evaluation of the reasonableness of the arrangement to know that VRA was receiving more than

---

[5] *See* 408b-2 Disclosure for ███████████████████ one of the Plans, attached as Exhibit 6

fifty percent of the total PAM Service fee for performing virtually none of the overall services.

98.     In addition, the 5500s for Nestle and for the other Plans failed to adequately disclose the services provided by VRA and Financial Engines and the compensation they received. The instructions for the Form 5500, Schedule C[6] require that all direct compensation from a plan received by a service provider, as well as all indirect compensation that is not eligible indirect compensation, must be separately disclosed and quantified. VRA received significant direct compensation from the Plans, but its compensation was not disclosed. Because VRA's compensation arose under the IASA, and not the ASA, it was not part of a "bundled service arrangement" within the meaning of the instructions and had to be separately disclosed. Even if, arguendo, the IASA were part of a bundled service arrangement including the ASA, the services provided by VRA and Financial Engines were "fiduciary" services and/or "investment advisory (plan or participants)" services that were required to be separately disclosed. Even if any of the compensation received by VRA or Financial Engines were "eligible indirect compensation" (and it was not), the Instructions required separate written disclosures, describing the (1) existence, (2) underlying services, (3) amount or formula, and (4) identity of parties, be delivered to the plans fiduciaries. Defendants did not produce any such written disclosures in discovery in this matter, and Defendants' counsel represented that Defendants had produced all disclosures made by or on behalf of VRA and its services. Thus, on information and belief, no such disclosures were ever created or made. These Form 5500 disclosure violations are particularly troubling under the circumstances because, on information and belief, Voya Institutional itself was responsible under

---

[6] Available at https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2016-instructions.pdf

each of the ASAs for compiling and filing the Form 5500s for the Plans.

99.    Finally, after entry into the IASA with each Plan, VRA was indisputably a fiduciary for the Plans and their participants. In that capacity, VRA communicated information about the PAM Services to Plan participants who were investigating whether to sign up for those services, deciding whether to purchase those services, or who were already receiving the PAM services and were investigating the costs and terms of those services. When communicating with those participants, VRA failed to disclose, misrepresented and/or concealed key information about the fees being charged for the PAM Services. In particular, VRA failed to disclose, misrepresented and/or concealed that (a) only Financial Engines provided any material services under the agreement, (b) that VRA kept a significant portion of the fees despite not performing any services (or not performing any services for which Voya Institutional was already being compensated under the ASA), or that (c) the fees for the services were greatly inflated in order to pay VRA's share.

## DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT

100.    As alleged above (¶¶ 96-99), Defendants undertook a number of stratagems designed to conceal the fact that VRA was collecting significant fees as part of a kickback (or, at best, a double-dipping) scheme through which it was not providing any material services.

101.    For example, Defendants added language to the Master Agreement and IASA identifying services nominally provided by VRA in connection with the PAM Services, but concealed the fact that Voya Institutional was already obligated to provide those services under the ASAs.

102.    In addition, Defendants' 408b-2 disclosures and Form 5500s concealed the amount of compensation VRA and FE received, respectively, and omitted any information about the services that VRA specifically—as opposed to Financial Engines–even nominally provided in

exchange. (*See* ¶¶ 96-98, *supra*).

103.    But perhaps the most fundamental part of Defendants' scheme to conceal the nature and extent of the fees they received was the use of VRA itself. On information and belief, VRA had few, if any, employees that were not also employed by Voya Institutional or Voya Financial. Instead, VRA was purely a name on a contract –Voya Institutional needed a registered investment advisor it controlled to interpose between Financial Engines and the Plans and the participants, and interposed VRA purely for the formality of having a registered investment advisor's name on the agreements.  The entire IASA does nothing but support the fiction that VRA is acting as an investment manager when it had absolutely nothing to do with the actual advice program. Defendants have argued that VRA was not a fiduciary with respect to the negotiation of its agreement to provide managed account services and, therefore, cannot be held liable for any breaches of fiduciary duty with respect to that agreement.  That argument presumes that a party negotiating an agreement to serve as a fiduciary investment manager can deceive a plan sponsor regarding the services to be provided, and avoid any liability for the deception because it occurred prior to the moment the investment manager became a fiduciary.  Regardless of the efficacy of that argument, it does not apply to "negotiation" of the agreements between VRA and individual plan participants, which by necessity were all negotiated after VRA signed its agreement with the Nestle Plan and became a plan fiduciary.  VRA was then obligated to tell participants the truth about the services it was providing and it failed to do so.

104.    That conclusion is supported by the Master Agreement, which confirms that FE is providing the computer model, direct interface with participants for data input, and all communications materials for the purpose of allowing VRA to rebrand the service and offer it to plan sponsors as if all VRA was actually providing the service.

30

105.    VRA passed on a portion of the fees it received to Voya Institutional, its sole member, as "dividends" each year. *See* Exhibit 7, 2015 VRA Form X-17A-5, at 5.

## FIDUCIARY STATUS UNDER ERISA

106.    "Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)

107.    ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

108.    The plan may also expressly provide a procedure for allocating responsibilities among fiduciaries or for named fiduciaries to designate others to carry out fiduciary responsibilities. ERISA § 405(c)(1); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 710 n.4 (2d Cir. 2013).

109.    ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. *LoPresti*, 126 F.3d at 40. Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i) & (iii).

110.    Thus de facto fiduciary status under ERISA does not depend on exercise of control over plan assets – anyone who exercise discretionary control over the management of the plan is a fiduciary. ERISA § 3(21)(A)(i). Thus "disposition of Plan assets is not necessary in order for the fiduciary duty to arise," and "administering or managing the plan" is itself sufficient for fiduciary status. *Fin. Institutions Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142, 148 (2d Cir. 1992).

111.    ERISA also provides that anyone who "renders investment advice for a fee or other

compensation, direct or indirect, with respect to any monies or other properties of such plan, or

has any authority or responsibility to do so" is a fiduciary. ERISA § 3(21)(A)(ii). Regulations

adopted by the DOL clarify that a person is such an investment advisor fiduciary if they "make[]

recommendations as to the advisability of investing in, purchasing, or selling securities or other

property" and either (A) have "discretionary authority or control" pursuant "to agreement" with

respect to "purchasing or selling securities or other property for the plan," or (B) "render[] any

advice, on a regular basis to the plan pursuant to a mutual agreement, arrangement or

understanding, written or otherwise, between such person and the plan … that such services will

serve as a primary basis for investing decision … and that such person will render individualized

investment advice to the plan based on the particular needs of the plan…" 29 C.F.R. § 2510.3-

21(c)(1).

112.    Appointing a fiduciary is itself an act of discretionary control over a plan. As such,

appointing a fiduciary is a fiduciary function, and those who appoint fiduciaries are subject to

ERISA's fiduciary duties to the extent they do so. *E.g.*, *Whitfield v. Tomasso*, 682 F. Supp. 1287,

1305 (E.D.N.Y. 1988) ("By virtue of its authority to appoint and remove the union trustees, and

by effectively controlling the selection of employer trustees, defendant Allied both had and

exercised discretionary authority and control respecting management of the Fund."); *Liss v. Smith*,

991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power

to appoint plan trustees confers fiduciary status."). In addition, hiring a non-fiduciary service

provider for a plan is also a fiduciary function.[7]

113.    In addition, a service provider to an ERISA plan with discretionary control over the

---

[7] *Meeting Your Fiduciary Responsibilities*, EBSA ("Hiring a service provider in and of itself is a fiduciary function."). http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited July 28, 2016).

factors that determine the amount of compensation it receives for its services is a fiduciary for those purposes. *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) ("After a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation."); *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (service provider was fiduciary where they "exercised unhampered discretion in setting" amount of their compensation). And, where a contract with a service provider establishes an "aggregate rate" that includes both the contractor's fee and the amount to be paid to a subcontractor, the contractor is a fiduciary if the fees for the contractor and the subcontractor "were distinct fees for distinct services" and the contractor could renegotiate rates with the subcontractor and "pocket[] the savings," thereby "unilaterally increase[ing] its own fees." *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 470 (S.D.N.Y. 2014).

### The Named Fiduciaries were Fiduciaries.

114. The Named Fiduciaries are "named fiduciaries" under ERISA § 402(a)(1).

115. The Named Fiduciaries caused the Plans to enter into the IASAs with VRA in their fiduciary capacities. *See* ¶¶ 69-70.a, *supra*.

### Financial Engines was a Fiduciary.

116. Financial Engines has acknowledged in writing that it is an ERISA fiduciary with respect to the investment advice it provides to retirement plan investors.

    a. On July 21, 2015, Financial Engines sent a letter to the Department of Labor in which it explained that it provides its personalized investment advice and management services to retirement plan investors "as a fiduciary" under ERISA.

See ¶ 54, *supra*.

b. In its Annual Report Form 10-K filed with the SEC, Financial Engines explains that where it has a direct relationship with the plan, Financial Engines is "the primary advisor and a plan fiduciary" with respect to the Online Advice and PAM Services. With respect to plans, such as certain of the Plans, where VRA is the "primary advisor" with respect to the Online Advice and PAM Services, the Annual Report Form 10-K notes that FE provides essentially the same services to the plan participants but "under the plan provider's brand." *See* ¶¶ 59-60, *supra*.

117.    The services Financial Engines provides to the Plans satisfy the definition of "investment advice for a fee" within the meaning of ERISA § 3(21)(A)(ii) and 29 C.F.R. § 2510.3-21(c)(1)(A) and (B):

a. Financial Engines "rendered investment advice" to the Plans and their participants in exchange for "direct or indirect" compensation with respect to the money each participant had saved in their Plan. ERISA § 3(21)(A)(ii).

b. Participants in the PAM Services program gave Financial Engines "discretionary authority or control" to actually buy and sell securities in their Plan accounts on their behalf. 29 C.F.R. § 2510.3-21(c)(1)(A).

c. Under both the PAM Services and the investment advice programs offered by Financial Engines, Financial Engines provided advice on a regular basis, pursuant to agreements (between Financial Engines and VRA, between VRA and the Plans, and between Plan participants and Financial Engines), with the express or implied understanding that the investment advice would serve as "a primary basis" for the participants' investment decisions, and Financial Engines' software generated

individualized investment advice to each participant based on their particular needs.

29 C.F.R. § 2510.3-21(c)(1)(B).

### *VRA was a Fiduciary.*

118.    VRA entered into the IASAs with the Named Fiduciaries for each Plan.

119.    In the IASAs, VRA acknowledged that it was a plan fiduciary "with respect to the services provided under" the IASAs. *See supra* ¶ 70.b, citing Master Agreement, Sample IASA, at VRA0000036, § 2(b).

120.    VRA also agreed to "discharge its duties" under the IASA in accordance with ERISA's fiduciary duties. *See supra* ¶ 70.c, citing Master Agreement, Sample IASA, at VRA0000037, § 4.

121.    Some of the 408b-2 disclosures recite that VRA "acts as a fiduciary as defined under ERISA § 3(21)" for "purposes of the advisory services." Ex. 6, Occidental 408b-2 Disclosure, at VRA0001673.

122.    Under the IASAs, VRA had express fiduciary responsibility for appointing Financial Engines as a service provider for the Plans. The IASAs recite that it was VRA—and not the Named Fiduciaries—that retained FE as a subadvisor to provide investment advice to the plans participants. *See* ¶ 70.e, *supra* (VRA "has engaged" Financial Engines). In the alternative, VRA exercised *de facto* control over the appointment of FE.

123.    As alleged above, *supra* ¶¶ 116-117, FE was a fiduciary of the Plans. Because appointing a fiduciary for an ERISA plan is an exercise of "discretionary authority or discretionary control respecting management" of the plan, *see* ¶ 112, *supra*, and because VRA exercised express authority and/or other de facto control over the appointment of FE, *see* ¶ 122, VRA exercised "discretionary authority or discretionary control" over the management of the Plans, and is, as

such, an ERISA fiduciary. ERISA § 3(21)(A)(i). It was through its control over the appointment of FE that VRA and Voya Institutional were able to get FE to agree that VRA could retain a significant portion of the investment advisory fees despite not performing any material services in exchange.

124.    The IASA also expressly gave VRA discretion to determine how much to pay FE. *See* ¶ 70.d, *supra* (VRA "will be responsible for the payment of any compensation due to Financial Engines."). And in each IASA, VRA agreed in writing that it was subject to ERISA's fiduciary duties with respect to its obligations under the IASA. *See* ¶ 70.b-c, *supra*.

125.    Thus VRA was an *express* fiduciary, not merely a de facto fiduciary, with respect to deciding how much to pay Financial Engines.  By virtue of its express fiduciary authority to determine how much of the investment advisory fees collected under the IASA would be paid to FE, VRA had control over how much of the fees it would keep for itself. Under the IASA, then, VRA had express fiduciary authority to determine how much of the investment advisory fees it would keep for itself and how much it would pay to FE.

    a.   The IASAs establish only an "aggregate rate" that included both VRA's fee for the services it claimed to provide and the amount to be paid to FE for the underlying investment and managed accounts services. Nothing about the IASA limited VRA's discretion to renegotiate its rates with FE and pocket the savings, thereby unilaterally increasing its own fees. VRA is as such a fiduciary. *Supra* ¶ 113, *United Teamster Fund, LLC*, 39 F. Supp. 3d at 470.

    b.   In addition, VRA's negotiations for its fees with the Named Fiduciaries and FE were not at arm's length. *See supra* ¶¶ 38-39, 57-80.

***Voya Institutional was a Fiduciary.***

126.     As the Plans' recordkeeper, Voya Institutional used its influence as recordkeeper to exercise de facto control over the appointment of FE and VRA as investment advisors. *See* ¶¶ 74-80, *supra*. As alleged above,

   a.  Voya Institutional, through its subsidiary VRA, undertook express contractual obligations to market Financial Engines' services to its recordkeeping clients;

   b.  Voya Institutional thus used its position and influence as the Plans' recordkeeper to push for the retention of Financial Engines and VRA; and

   c.  On information and belief, Voya Institutional maintained an exclusive relationship with Financial Engines as a provider of investment advisory services and would not have agreed to cooperate with any other investment advisory service provider;

   d.  As a practical matter, given the costs and difficulties of changing recordkeepers, Voya Institutional and could and did insist on the inclusion of Financial Engines and VRA as service providers if the Plans' Named Fiduciaries wished to provide participant investment advisory services.

127.     Because appointing a fiduciary for an ERISA plan is an exercise of "discretionary authority or discretionary control respecting management" of the plan, and because Voya Institutional exercised de facto control over the appointment of FE and VRA, Voya Institutional exercised "discretionary control" over the management of the Plans, and is, as such, an ERISA fiduciary. ERISA § 3(21)(A)(i).

128.     It was through its control over the appointment of FE and VRA that Voya Institutional was able to get FE to agree that VRA could retain a significant portion of the

investment advisory fees despite not performing any material services in exchange.

## FIDUCIARY DUTIES UNDER ERISA

129.    Fiduciaries for retirement plans owe the plan and its participants and beneficiaries duties described as among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

130.    When choosing service providers for a retirement plan, and especially when choosing a service provider who will be a fiduciary to the retirement plan, an ERISA plan fiduciary is required to act with the care, skill, prudence and diligence that would be exercised by someone who is experienced and knowledgeable about the services to be provided; a prudent expert. Most fundamentally, ERISA fiduciaries are required to act solely in the best interests of plan participants. ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1).

131.    Specifically with respect to that most fundamental fiduciary obligation, ERISA prohibits a plan fiduciary from: (i) dealing with the assets of the plan for its own benefit or for its own account; (ii) representing a party or acting in a transaction on behalf of a party whose interests are adverse to the interests of the plan or its participants; and (iii) receiving for its own account any consideration from a party dealing with such plan in a transaction involving plan assets. ERISA § 406(b), 29 U.S.C. § 1106(b).

132.    These fiduciary duties are especially important in the context of fees paid directly by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement. As the Supreme Court explained in 2015, in defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135

S. Ct. 1823, 1825 (2015). Thus over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement -- "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* In the context of individual account defined contribution plans, additional fees of only 0.18% or 0.4% can have a large effect on your investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (en banc).

133.    The obligation ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties, as the Second Circuit recognized as long ago as 1978. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [fiduciaries].").

134.    A 2009 study by the Government Accountability Office found that "even a seemingly small fee can have a large negative effect on savings in the long run. As shown in figure 1 [included below], an additional 1 percent annual charge for fees would significantly reduce an account balance at retirement." Government Accountability Office, 401(K) PLANS Several Factors Can Diminish Retirement Savings, but Automatic Enrollment Shows Promise for Increasing Participation and Savings, No. 10-153T, available at http://www.gao.gov/assets/130/123628.pdf, at 9-10.



Figure 1: Effect of 1-Percentage Point Higher Annual Fee on a $20,000 DC Plan Balance Invested over 20 Years

*Id.*

135.   The content of ERISA fiduciary's duties are "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble,*135 S. Ct. at 1828; accord *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (ERISA's duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts").

136.   Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."); *Tibble*, 843 F.3d at 1190. The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition,

this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added).

137.   The Fourth Circuit explains that "[f]iduciaries ... ordinarily have a duty to seek ... the lowest level of risk and cost for a particular level of expected return—or, inversely, the highest return for a given level of risk and cost." *Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 566 (4th Cir. 2017) (quoting Restatement (Third) of Trusts § 90 cmt. f(1)); *see also* DOL, A Look at 401(k) Plan Fees (Aug. 2013),[8] at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

138.   Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable: "Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . ." DOL Adv. Opinion 97-15A (1997); DOL Adv. Opinion 97-16A (1997).

139.   The Department of Labor has repeatedly warned: "While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to

---

[8] Available at https://www.dol.gov/ebsa/publications/401k_employee.html. (Last visited July 18, 2017).

determine whether they continue to be reasonable." DOL, Meeting Your Fiduciary

Responsibilities (Feb. 2012), at 5.[9]

140.    In a separate publication, the Department of Labor writes:

The Federal law governing private-sector retirement plans, the Employee Retirement
Income Security Act (ERISA), requires that those responsible for managing retirement
plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in
the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries
have a responsibility to ensure that the services provided to their plan are necessary and
that the cost of those services is reasonable.
                                        * * *
Plan fees and expenses are important considerations for all types of retirement plans. As a
plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan
investments, investment options made available to the plan's participants and beneficiaries,
and the persons providing services to your plan. Understanding and evaluating plan fees
and expenses associated with plan investments, investment options, and services are an
important part of a fiduciary's responsibility. This responsibility is ongoing. After careful
evaluation during the initial selection, you will want to monitor plan fees and expenses to
determine whether they continue to be reasonable in light of the services provided.
                                        * * *
By far the largest component of plan fees and expenses is associated with managing plan
investments. Fees for investment management and other related services generally are
assessed as a percentage of assets invested. Employers should pay attention to these fees.
They are paid in the form of an indirect charge against the participant's account or the plan
because they are deducted directly from investment returns. Net total return is the return
after these fees have been deducted. For this reason, these fees, which are not specifically
identified on statements of investments, may not be immediately apparent to employers."

DOL, Understanding Retirement Plan Fees and Expenses (Dec. 2011), at 1-2, 4.[10]

## CLASS ACTION ALLEGATIONS

141.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring

an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan

under 29 U.S.C. § 1109(a).

---

[9] Available at http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html. (Last visited
July 18, 2017).
[10] Available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html. (Last visited July 18,
2017).

142.    In acting in this representative capacity, and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiff seeks to certify this matter as a class action on behalf of all participants and beneficiaries of the Nestle Savings Plan and the Plans. Plaintiff seeks to certify, and to be appointed as representative of, the following class (the "Class"):

> The participants in and beneficiaries of the Nestle Savings Plan and every other participant-directed individual account Plan for which Voya Institutional and VRA provide recordkeeping, investment management, or investment advisory services, and for which FE provides investment advice to Plan participants either directly or as sub advisor to VRA, one or more of whose participants have elected to utilize FE's services, at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breach, the first date on which VRA provided managed account investment advice services through Financial Engines either directly or as sub advisor to VRA, and in either case, through the date of judgment (the "Class Period").

143.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The proposed Class includes hundreds if not thousands of members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to the Class because the

Defendants owed fiduciary duties to the Nestle Savings Plan and to all Plans and took the actions and omissions alleged herein as to all of the Plans and not as to any individual Plan. Thus, common questions of law and fact include the following, without limitation: whether Defendants are fiduciaries with respect to the Plans and are liable for the remedies provided by 29 U.S.C. §1109(a); whether as fiduciaries of the Plans, Defendants breached their fiduciary duties to the Plans; how the losses to the Plans resulting from each breach of fiduciary duty are to be calculated; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

      c.    Plaintiff's claims are typical of the claims of the Class because Plaintiff was a Nestle Savings Plan participant during the time period at issue in this action, utilized FE's services, and all similarly situated participants in the Plans were harmed by Defendants' misconduct.

      d.    Plaintiff is an adequate representative of the Class because she was a participant in the Nestle Savings Plan, was affected by the fees in question during the Class Period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

      e.    Prosecution of separate actions by individual Plans for these breaches of fiduciary duties would create the risk of: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (2) adjudications by the Nestle Savings Plan regarding these breaches of fiduciary duties and remedies for the Nestle Savings Plan would, as a practical matter, be dispositive of the interests of the Plans not parties to the adjudication or would substantially impair or impede those Plans' ability to

protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

144.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual Plans may be small and impracticable for individual Plans to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

145.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

### COUNT I

**Knowing Participation in Named Fiduciaries' Conduct that Violated ERISA
Equitable Relief Under ERISA § 502(a)(3)
All Defendants**

146.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

147.    ERISA § 502(a)(3) permits ERISA plan participants, such as Plaintiff, to bring a civil action "to obtain other appropriate equitable relief" to "redress" "any act or practice which violates any provision" of ERISA.

148.    The Supreme Court has held that non-fiduciaries who receive the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have

"actual or constructive knowledge of the circumstances that rendered the transaction unlawful."

149.     In this case, participants in the Plans who used the PAM service paid fees to VRA, even though VRA did not provide any services in exchange for those fees that Voya Institutional was not already obligated to provide and compensated for providing under the ASAs.

150.     Even assuming that neither VRA nor Voya Institutional was an ERISA fiduciary for purposes of the payment of the fees, payment of those fees to VRA was unlawful under ERISA. In particular, payment of the fees was a prohibited transaction under ERISA § 406(a)(1)(C) and (D).

    a.   The Named Fiduciaries, acting as fiduciaries for the Plans, caused the payments to VRA when they entered into the IASAs.

    b.   VRA paid itself the fees in question by selling some of the securities in participants' Plan accounts, nominally in exchange for services VRA claimed to have provided. Thus the payments to VRA were:

        i.   a "furnishing of … services… between the plan [the Plans] and a party in interest [VRA]" in violation of ERISA § 406(a)(1)(C); and

       ii.   a "a transfer to, or use by or for the benefit of a party in interest [VRA], of any assets of the plan [the securities' sold to pay VRA's fees]."

    c.   The Named Fiduciaries knew or should have known that the payment of fees to VRA under the IASAs amounted to transactions prohibited by ERISA § 406(a)(1)(C) and (D).

        i.   The Named Fiduciaries had at least constructive knowledge of the terms of the ASAs and IASAs.

           1.   The duties of prudence and loyalty imposed on ERISA plan

fiduciaries, such as the Named Plan fiduciaries, are the "highest known to the law." *See* ¶ 129, *supra*.

2. Those duties require plan fiduciaries to undertake a care investigation of the merits of any proposed transaction involving the plan.

3. At a minimum, a plan fiduciary has an obligation to understand the terms of the agreements it enters into on behalf of the plan, especially with respect to the fees charged.

4. As a result of their legal duty to understand the terms of the transactions they cause the plans they serve to enter into, plan fiduciaries have constructive knowledge of the terms of any agreements that they enter into on behalf of their plans.

5. Thus the Named Fiduciaries have at least constructive knowledge of the terms of all of the agreements they entered into on behalf of the Plans, including the ASAs with Voya Institutional and the IASAs with VRA.

ii. Here, the Named Fiduciaries' constructive knowledge of the terms of the IASAs is sufficient to satisfy the requirement of ERISA § 406(a)(1) that a fiduciary who causes a transaction "knows or should know" that the transaction fits within one of the five prohibited categories in ERISA § 406(a)(1). It is obvious from the face of the IASAs that the payment of fees to VRA is prohibited by ERISA § 406(a)(1)(C) and (D), and because the Named Fiduciaries have at least constructive knowledge of the terms of the

IASAs, they have the requisite knowledge that the transactions were prohibited for purposes of ERISA § 406(a)(1).

151.     A transaction prohibited by ERISA § 406(a) will be exempt if the defendant carries their burden of proof to show that it fits within one of the prohibited transaction exemptions set forth in ERISA § 408.

152.     ERISA § 408(b)(2) exempts "reasonable arrangements" between plans and parties in interest for necessary services "if no more than reasonable compensation is paid therefor." Thus in order to qualify as reasonable contract within the meaning of ERISA § 408(b)(2), an agreement must be "reasonable," must provide for "necessary services," and must pay "no more than reasonable compensation." ERISA § 408(b)(2); 29 C.F.R. § 2550.408b-2(a)(1)-(3). For a service provider to claim an agreement is "reasonable," the service provider must comply with the disclosure rules set forth in 29 C.F.R. § 2550.408b-2(c)(1). *See* ¶¶ 96-97.e, *supra*.

153.     Without in any way admitting that Plaintiff bears the burden of pleading or proving the inapplicability of any provision of ERISA § 408, or pleading or proving that any fiduciary had knowledge that ERISA § 408 was not satisfied for purposes of establishing liability under ERISA § 502(a)(3), the fees paid to VRA under the IASAs fail to satisfy ERISA § 408(b)(2) for a number of reasons.

    a.  Here, neither VRA nor Voya Institutional provided and material services in exchange for the fees VRA received for the PAM Services, and any services they provided were services Voya Institutional was already obligated to provide and compensated for providing as the Plans' recordkeeper – and thus at a minimum amounted to "double dipping." And, as alleged above, the fees were in fact a kickback designed to compensate Voya Institutional for using its influence to

secure new business for Financial Engines. Fees compensating a fiduciary who provides no services are not "reasonable compensation" within the meaning of ERISA § 408(b)(2); 29 C.F.R. § 2550.408b-2(a)(3) & (d); 29 C.F.R. § 2550.408c-2(b)(1).

b. In addition, the 408b-2 disclosures provided by Defendants did not comply with the disclosure rules set forth in 29 C.F.R. § 2550.408b-2(c)(1). *See* ¶¶ 96-97.e, *supra*.

154.    As explained above, because the Named Fiduciaries caused the Plans to enter into the ASAs and IASAs, they had constructive knowledge of the terms of those agreements. As such, the Named Fiduciaries had constructive knowledge that the fees received by VRA were not "reasonable compensation" because:

a. On its face, the IASA imposes no substantive obligations on VRA except appointing Financial Engines and dividing up compensation between itself and Financial Engines.

b. The IASA is clear that all investment advisory services would be provided by Financial Engines.

c. A plan fiduciary has an obligation to investigate and understand the services being provided to plans and the fees the plans are paying in exchange.

d. In this case, on the face of the IASA, VRA was receiving money, the amount of which was left up to VRA and Financial Engines, even though VRA was not providing any services under the IASA. That face alone would have caused a reasonable fiduciary to investigate the amount of the fee that VRA was receiving the nature and value of the services VRA was providing in exchange.

e. A reasonable fiduciary would thus have sought out and obtained a copy of the Master Agreement (or conducted an investigation sufficient to learn its terms). The Master Agreement specifies the division of fees between VRA and Financial Engines and identifies the services that VRA was purportedly providing in exchange for the fees.

f. As such, the Named Fiduciaries had constructive knowledge of the services that VRA was purportedly providing and the division of the fees between VRA and Financial Engines.

g. As explained above, all of the obligations imposed on VRA under the Master Agreement were services that Voya Institutional was already obligated to provide under the ASAs and for which Voya Institutional was being compensated. Because a reasonable fiduciary would have conducted an investigation sufficient to learn those facts, the Named Fiduciaries were on constructive notice that the fees VRA received were not "reasonable compensation" because VRA was not providing any material services in exchange and that any services being performed were performed by Voya Institutional, which was already obligated to provide those services under the ASA.

155. In addition, the Named Fiduciaries had at least constructive knowledge that the arrangement with VRA was not a "reasonable arrangement" under ERISA § 408(b)(2). The Named Fiduciaries had an obligation to review and understand the contents of the 408b-2 disclosures, and as such had at least constructive knowledge of their contents. Given their constructive knowledge of the services that VRA and Voya Institutional were (and were not) providing and the fees they were receiving, the Named Fiduciaries had constructive knowledge that the 408b-2 disclosures

50

were insufficient to comply with 29 C.F.R. § 2550.408b-2(c)(1), and that the arrangement with VRA was thus not a "reasonable arrangement" under ERISA § 408(b)(2). *See* 29 C.F.R. § 2550.408b-2(c)(1); (a)(2).

156.    Thus by executing the IASAs in their fiduciary capacity, the Named Fiduciaries caused the Plans to pay VRA fees that were unreasonable pursuant to a contract that was also not reasonable with at least constructive knowledge that the fees were unreasonable and the contract was not reasonable.

157.    VRA and Voya Institutional obviously had actual or constructive knowledge of the terms of the IASA, including the fees VRA received and the services they provided, as well as the contents of the 408b-2 disclosures. VRA and Voya Institutional thus had at least constructive knowledge of the circumstances that rendered the transactions prohibited under ERISA § 406(a) and not exempt under ERISA § 408(b)(2) or 29 C.F.R. § 2550.408b-2. Voya Institutional and VRA thus knowingly participated in the non-exempt prohibited transactions described herein.

158.    VRA kept some of those fees for itself. VRA also remitted a portion of those fees to its only member, Voya Institutional, in the form of "dividends." *See* ¶ 105, *supra*.

159.    On information and belief, Voya Institutional paid to Voya Financial a portion of the fees Voya Institutional received from VRA. Voya Institutional is a wholly owned subsidiary of Defendant Voya Financial, and VRA is a wholly owned subsidiary of Voya Institutional. Voya Institutional and VRA thus acted as agents of Voya Financial with respect to the conduct alleged herein, which was undertaken for the ultimate benefit of Voya Financial. Thus all of the actual and constructive knowledge of VRA and Voya Institutional about the conduct at issue was imputed to Voya Financial. Voya Financial is thus a gratuitous transferee of the ill-gotten fees with actual or constructive knowledge of the circumstances rendering the transaction unlawful.

160.    The fees VRA retained from the Plans in good conscience belong to the Plans, and are therefore subject to a constructive trust in favor of the Plans. VRA, Voya Institutional and Voya Financial, as the knowing recipients of the ill-gotten fees, are constructive trustees of those fees. As constructive trustees, to the extent the fees are traceably in Defendants' possession, under ERISA § 502(a)(3) Defendants must disgorge those fees as well as their traceable product and any traceable profits therefrom, in whatever form held.

## COUNT II

**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1) and (a)(3)**
**Defendants Voya Institutional and VRA**

161.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

162.    A fiduciary with respect to a plan liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

163.    As alleged above, Defendant VRA was an express fiduciary with respect to the Plans under the IASAs, and was also a de facto fiduciary. *See* ¶¶ 118-125, *supra*.

164.    As alleged above, Defendant Voya Institutional was a de facto fiduciary with respect to the Plans. *See* ¶¶ 126-128, *supra*.

165.    As alleged above, the Named Fiduciaries of the Plans engaged in transactions prohibited by ERISA § 406(a) by entering into the IASAs which allowed VRA to pay itself money despite not performing any material services in exchange. *See* ¶ 150, *supra*.

166. As alleged above, Defendants VRA and Voya Institutional knowingly participated in those prohibited transactions. VRA and Voya Institutional knowingly carefully structured and carried out the transactions themselves in order to achieve the precise outcome that made the transactions unlawful: that VRA got money despite not performing any material services. Moreover, as alleged above, Defendants VRA and Voya Institutional undertook to conceal those breaches. *See* ¶¶ 100-105, *supra*. Thus VRA and Voya Institutional violated ERISA § 405(a)(1) by knowingly participating in and knowingly undertaking to conceal the breaches and prohibited transactions caused by the Named Fiduciaries.

167. And because VRA and Voya Institutional undertook no efforts whatsoever to remedy those breaches and prohibited transactions, VRA and Voya Institutional violated ERISA § 405(a)(3).

168. ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

169. Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

170. Thus Defendants VRA and Voya Institutional are liable, in an amount to be determined at trial, for the losses to the Plans caused by their violations of ERISA § 405(a)(1) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

## COUNT III

## Prohibited Transaction
## ERISA § 406(b)(2)

53

**Defendant VRA**

171.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

172.     ERISA § 406(b)(2) prohibits ERISA plan fiduciaries from acting "in his individual or in any other capacity" in "any transaction involving the plan on behalf of a party (or represent[ing] a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

173.    As alleged above, Defendant VRA was an express fiduciary with respect to the Plans under the IASAs, and was also a de facto fiduciary. *See* ¶¶ 118-125, *supra*

174.    Under the Master Agreement, VRA agreed to market Financial Engine's services to the Plans for which Voya Institutional was serving as recordkeeper in a variety of transactions involving the Plans. *See* ¶¶ 75-76, *supra*.

175.    VRA in fact undertook the marketing obligations set forth in the master agreement. *See* ¶ 77, *supra*.

176.    Financial Engines was attempting to market its services to the Plans for a fee, and therefore had interests adverse to the Plans. In addition, Financial Engines was seeking to obtain fees for VRA as a kickback to VRA, and had interests adverse to the Plans for that reason as well. Supra ¶¶ 55-95.

177.    VRA's conduct in marketing Financial Engines' services therefore violated ERISA § 406(b)(2).

178.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

179.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including

ERISA § 406(b)(2), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 406(b)(2), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

180.    Thus Defendant VRA is liable, in an amount to be determined at trial, for the losses to the Plans caused by its violations of ERISA § 406(b)(2), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

### COUNT IV

**Breach of Duty of Loyalty**
**ERISA § 404(a)(1)(A) and ERISA § 406(b)(1)**
**Defendants Voya Institutional and VRA**

181.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

182.     ERISA § 404(a)(1)(A) requires ERISA plan fiduciaries to perform their fiduciary duties and responsibilities exclusively in the interests of Plan participants for the purpose of providing them benefits under the Plans.

183.    Similarly, ERISA § 406(b)(1) prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

184.    Acting as an express fiduciary under the IASA, Defendant VRA either appointed FE or exercised de facto control over FE's appointment as a fiduciary for the Plans, and used that authority to get FE to agree that VRA could keep a significant fee with respect to the investment advisory services despite the fact that VRA did not provide any material services in exchange. In addition, acting as an express fiduciary under the IASA, Defendant VRA determined how much to pay FE, and by extension, how much of the investment advisory fees VRA could keep for itself. Defendant VRA was thus a fiduciary with respect to the amount of its own compensation, and

breached the duty of loyalty by retaining fees for itself despite not providing any material services in exchange.

185.    Defendant Voya Institutional used its relationship with the Plans to cause FE to be retained as an investment advisor for the Plans' participants. By exercising de facto control over the retention of FE, or in the alternative by playing a role in the retention of FE, Defendant Voya Institutional acted as an ERISA fiduciary with respect to the Plans. And in so doing, Voya Institutional caused FE to agree that it VRA could keep a significant portion of the investment advisory fees charged to the Plans.

186.    This conduct by VRA and Voya Institutional violated the duty of loyalty under ERISA § 404(a)(1)(A) and the prohibition against self-dealing set out in ERISA § 406(b)(1).

187.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

188.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

189.    Thus Defendant VRA is liable, in an amount to be determined at trial, for the losses to the Plans caused by its violations of ERISA § 404(a)(1)(A) and ERISA § 406(b)(1), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

## COUNT V

### Breach of Duty of Loyalty
### ERISA § 404(a)(1)(A)
### Defendant VRA

190.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs

as if fully set forth herein.

191.    ERISA § 404(a)(1)(A) requires ERISA plan fiduciaries to perform their fiduciary duties and responsibilities exclusively in the interests of Plan participants for the purpose of providing them benefits under the Plans.

192.    ERISA fiduciaries that fail to disclose key information to plan participants about their benefits, or that misrepresent or conceal such information from plan participants, breach the duty of loyalty.

193.    As alleged above, Defendant VRA was an express fiduciary with respect to the Plans under the IASAs, and was also a de facto fiduciary. *See* ¶¶ 118-125, *supra.*  VRA failed to disclose, misrepresented and/or concealed key information about the fees being charged for the PAM Services when it communicated with participants in the Plans who were deciding whether to purchase those services. In particular, VRA failed to disclose, misrepresented and/or concealed that (a) only Financial Engines provided any material services under the agreement, (b) that VRA kept a significant portion of the fees despite not performing any services (or not performing any services for which Voya Institutional was already being compensated under the ASA), or that (c) the fees for the services were greatly inflated in order to pay VRA's share.

194.    The participants in the Plans who signed up for the PAM Services generally relied on VRA's failures to disclose, misrepresentations about and/or concealment of those facts.

195.    This conduct by VRA violated the duty of loyalty under ERISA § 404(a)(1)(A).

196.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

197.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a)(1)(A), must "make good" to the Plans the losses to the Plans resulting from its

violations of ERISA § 404(a)(1)(A), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

198.    Thus Defendant VRA is liable, in an amount to be determined at trial, for the losses to the Plans caused by its violations of ERISA § 404(a)(1)(A), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**COUNT VI**

**Party in Interest Transactions**
**ERISA § 406(a)**
**Defendant VRA**

199.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

200.    ERISA § 406(a)(1)(C) and (D) generally prohibit various "direct or indirect" transactions between plans and a "party in interest."

201.    ERISA § 3(14)(A) and (B) define plan fiduciaries and persons providing services to a plan as parties in interest.

202.    FE, VRA and Voya Institutional all provided services to the Plans, and were fiduciaries for the Plans. *See* ¶¶ 116-128, *supra*. As such, FE, VRA and Voya Institutional were all parties in interest for purposes of ERISA §§ 3(14) and 406.

203.    In an exercise of its fiduciary authority under the IASA, VRA caused the Plans to pay fees to VRA.

204.    VRA had actual or constructive knowledge that the liquidation of Plan assets to pay its fees was a "furnishing of … services… between the plan [the Plans] and a party in interest [VRA]" in violation of ERISA § 406(a)(1)(C), and a "transfer to… a party in interest [VRA], of any assets of the plan [the securities' sold to pay VRA's fees]" in violation of ERISA

§ 406(a)(1)(D).

205.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

206.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(a)(1)(C) and (D), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 406(a)(1)(A), (C) and (D), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

207.    Thus Defendant VRA is liable, in an amount to be determined at trial, for the losses to the Plans caused by its violations of ERISA § 406(a)(1)(C) and (D), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

208.    ERISA § 408(b)(2) exempts from the prohibitions of ERISA § 406(a) "contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid therefor*" (emphasis added). DOL regulations expound on the requirements of ERISA § 408(b)(2), in addition to requiring that the compensation be reasonable, also require that the service provider must provide detailed disclosures in order to take advantage of the ERISA § 408(b)(2). 29 C.F.R. § 2550.408b-2(a)(1)-(3).

209.    This Court has previously ruled that "[a] defendant bears the burden of showing that an exemption to § 1106 applies. … Because the defendant has the burden of proof, whether an exemption precludes a plaintiff's prohibited transaction claim is treated as an 'affirmative defense[ ] for pleading purposes.'" *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (Schofield, J.) (quoting *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016) (7th Cir. Aug. 25, 2016)). Accordingly,

"on a Rule 12(b)(6) motion, it must be clear from the face of the Complaint or judicially noticed court filings that the Plan's use of proprietary funds falls within an available exemption." *Moreno*, 2016 WL 5957307, at *6. And as such, "an ERISA plaintiff need not plead the absence of exemptions to prohibited transactions." *Allen*, 835 F.3d at 676.

210.    Without in any way admitting that Plaintiff bears the burden of pleading or proving the inapplicability of any provision of ERISA § 408, Plaintiff nevertheless specifically alleges that:

a.    VRA provided no material services in connection with the investment advice Plans, and that as such, the fees VRA received in connection with such services constitutes were not reasonable within the meaning of ERISA § 408(b)(2), 29 C.F.R. § 2550.408b-2(a)(3) & (d) and 29 C.F.R. § 2550.408c-2(b)(1);

b.    because a significant portion of the total fees paid by the Plans was used to pay VRA despite VRA not providing any material services, the total fees were also not reasonable within the meaning of ERISA § 408(b)(2), 29 C.F.R. § 2550.408b-2(a)(3) & (d); and that

c.    the 408b-2 Disclosures provided by Defendants did not satisfy 29 C.F.R. § 2550.408b-2(c)(1). *See* ¶¶ 96-97.e, *supra*.

**COUNT VII**

**Prohibited Kickback**
**ERISA § 406(b)(3)**
**Defendants Voya Institutional**

211.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

212.    ERISA's "anti-kickback" provision, ERISA § 406(b)(3), prohibits a fiduciary from receiving any consideration for its own personal account from any party dealing with such plan in

connection with a transaction involving the assets of the plan.

213.     As alleged above, Defendant Voya Institutional was a fiduciary by virtue of its control over the appointment of FE as a fiduciary for the Plan.

214.     Defendant Voya Institutional received "dividend" payments from VRA "in connection with" the PAM services that FE provided to the participants, services which included transactions of plan assets – in particular, the assets held in each particular participants' account.

215.     Defendant Voya Institutional thus violated ERISA § 406(b)(3).

216.     ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

217.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(b)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 406(b)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

218.     Thus Defendant Voya Institutional is liable, in an amount to be determined at trial, for the losses to the Plans caused by its violations of ERISA § 406(b)(3), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

## COUNT VIII

### Knowing Participation in VRA's Conduct that Violates ERISA
### Equitable Relief Under ERISA § 502(a)(3)
### Defendant Voya Institutional

219.     Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

220.     ERISA § 502(a)(3) permits ERISA plan participants, such as Plaintiff, to bring a civil action "to obtain other appropriate equitable relief" to "redress" "any act or practice which

violates any provision" of ERISA.

221.     The Supreme Court has held that non-fiduciaries who receive the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful."

222.     As alleged above, VRA also remitted a portion of the unlawful fees it collected from the Plans to its only member, Voya Institutional, in the form of "dividends." *See* ¶ 105, *supra*.

223.     And as alleged above, VRA acted as the agent of Voya Institutional, its sole member, with respect to the conduct set forth herein.

224.     And as alleged above, Voya Institutional knowingly participated in the conduct that rendered the fees unlawful.

225.     To the extent that the unlawful fees resulted from any of the misconduct by VRA set forth in Counts II – IV, *supra*, the fees VRA retained from the Plans and paid to Voya Institutional in good conscience belong to the Plans, and are therefore subject to a constructive trust in favor of the Plans.  Voya Institutional, as the knowing recipients of the ill-gotten fees, is a constructive trustees of those fees in favor of the Plans. As a constructive trustee, to the extent the fees are traceably in Voya Institutional's possession, under ERISA § 502(a)(3) Voya Institutional must disgorge those fees as well as their traceable product and any traceable profits therefrom, in whatever form held.

## COUNT IX

**Knowing Participation in VRA's and Voya Institutional's Conduct that Violates ERISA**
**Equitable Relief Under ERISA § 502(a)(3)**
**Defendant Voya Financial**

226.     Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

227.     ERISA § 502(a)(3) permits ERISA plan participants, such as Plaintiff, to bring a civil action "to obtain other appropriate equitable relief" to "redress" "any act or practice which violates any provision" of ERISA.

228.     The Supreme Court has held that non-fiduciaries who receive the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful."

229.     As alleged above, Voya Financial received all or a portion of the unlawful fees from Voya Institutional and VRA, its wholly owned subsidiaries.

230.     And as alleged above, Voya Institutional and VRA acted as the agents of Voya Financial with respect to the conduct set forth herein.

231.     To the extent that the unlawful fees resulted from any of the misconduct by Voya Institutional and/or VRA set forth in Counts II – VI, *supra*, the fees VRA retained from the Plans and paid to Voya Financial in good conscience belong to the Plans, and are therefore subject to a constructive trust in favor of the Plans.  Voya Financial, as the knowing recipients of the ill-gotten fees, is a constructive trustees of those fees in favor of the Plans. As a constructive trustee, to the extent the fees are traceably in Voya Financial's possession, under ERISA § 502(a)(3) Voya Financial must disgorge those fees as well as their traceable product and any traceable profits therefrom, in whatever form held.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment as follows:

A.     Certify this action as a class action as stated here and appoint Plaintiff's counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.      Declare that Defendants breached their fiduciary duties, cofiduciary duties and engaged in prohibited transactions as set forth above;

C.      Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.      Order that Defendants make good to the Plans the losses resulting from their serial breaches of fiduciary duty, breaches of cofiduciary duty and prohibited transactions;

E.      Order that Defendants disgorge any of the illegal fees they received that are traceably held in constructive trust for the Plans, as well as the traceable product of and profits from those fees held in constructive trust;

F.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plans;

G.      Order Defendants to pay prejudgment interest; and

H.      Award such other and further equitable and remedial relief as the Court deems equitable and just.

DATED this 18th day of July, 2017.

By:      /s/ John J. Nestico
John J. Nestico (JN8156)
Garrett E. Wotkyns
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 315-3841
Facsimile: (866) 505-8036
jnestico@schneiderwallace.com
gwotkyns@schneiderwallace.com

Todd M. Schneider
Mark T. Johnson
James A. Bloom (pro hac vice)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com

Todd S. Collins (pro hac vice)
Shanon J. Carson (pro hac vice)
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiff*